# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**DANIEL P. SEBRING,**
        **Plaintiff,**

    **v.**                      **Case No. 21-C-0959**

**MILWAUKEE PUBLIC SCHOOLS and
MILWAUKEE BOARD OF SCHOOL
DIRECTORS,**
           **Defendants.**

---

## DECISION AND ORDER

Daniel P. Sebring commenced this action in Milwaukee County Circuit Court against the Milwaukee Public Schools ("MPS") and the Milwaukee Board of School Directors. He contends that MPS's policy of allowing its employees who are union representatives to take up to ten days of paid leave each year to engage in union activities violates the free-speech guarantee of the Wisconsin Constitution, Article I, § 3, and Wisconsin's public-purpose doctrine. The plaintiff is not personally affected by the leave policy, but he contends that because he pays state and local taxes, which in turn are used to fund MPS, he indirectly subsidizes the policy and therefore has standing to challenge it in state court. The defendants removed the action to this court, contending that the plaintiff's claim under the Wisconsin Constitution "aris[es] under" federal law. 28 U.S.C. § 1331. Before me now is the plaintiff's motion to remand the case to state court and for an award of costs and attorneys' fees for wrongful removal. *See* 28 U.S.C. § 1447(c).

## I. BACKGROUND

According to the allegations of the First Amended Complaint, which the plaintiff filed in state court, MPS has an "Employee Handbook" that contains its policies related to

employee leave and absences. Compl. ¶ 9.[1] The handbook includes a section entitled "Union Leaves/Releases." *Id.* ¶ 11. According to this section, "[e]ach designated collective bargaining unit" may designate certain MPS employees as "union representatives." *Id.* MPS employees designated as union representatives are entitled to "a maximum of ten days per fiscal year" of paid leave to conduct "union-related activities." *Id.* ¶¶ 12, 15. The handbook does not define "union-related activities," *id.* ¶ 16, but the plaintiff alleges that union representatives use paid leave to engage in "union committee meetings, union conferences, union trainings, union employee appreciation events, and . . . other union business," *id.* ¶ 20. The handbook provides that union representatives may also take paid leave to attend grievance or complaint hearings and collective-bargaining negotiations, and that such leave does not count towards the ten-day maximum. *Id.* ¶ 14. The complaint alleges that, during the 2017, 2018, and 2019 school years, MPS spent "thousands of dollars paying employees for hundreds of hours working on behalf of labor unions for the labor unions' private purposes." *Id.* ¶ 17.

The plaintiff is a resident of the City of Milwaukee. *Id.* ¶¶ 5, 28. He alleges that he pays "local property taxes on an annual basis, state income taxes, and sales taxes." *Id.* ¶ 5. He alleges that "MPS is funded, in large part, by taxes paid by state and local taxpayers," and that "MPS receives more than $800 million per year from state and local taxpayers." *Id.* ¶¶ 26–27. He alleges that, because of MPS's union leave policy, taxpayer money is used to subsidize "the speech and activities of labor unions." *Id.* ¶ 25. The

---

[1] The complaint provides a hyperlink to the area of MPS's website that contains a PDF version of the handbook: https://mps.milwaukee.k12.wi.us/en/Employment/Current-Staff/Employment-Relations.htm.

2

plaintiff, however, "disagrees with the views expressed by, and much of the advocacy engaged in by various public sector labor unions, including MPS' Labor Unions, and does not wish to subsidize their activities." *Id.* ¶ 31.

Because of his opposition to the union-leave policy, the plaintiff filed the present suit in state court against MPS and the Milwaukee Board of School Directors, seeking declaratory and injunctive relief against the policy. His complaint contains two counts. Count One alleges that the union-leave policy violates the Wisconsin Constitution's guarantee of freedom of speech, Wis. Const. Art. I, § 3, because it uses tax dollars to subsidize the private speech of labor unions. Compl. ¶¶ 33–52. In this count, the plaintiff cites to cases decided by the Supreme Court of the United States involving the Free Speech Clause of the First Amendment, such as *Janus v. AFSCME, Council 31*, __ U.S. __, 138 S. Ct. 2448 (2018). *Id.* ¶¶ 38–43. He also cites to a case decided by the Wisconsin Supreme Court noting that the Wisconsin Constitution guarantees "the same freedom of speech . . . as do the First and Fourteenth Amendments of the United States Constitution." *Id.* ¶ 36 (citing *Lawson v. Housing Auth. of City of Milwaukee*, 270 Wis. 269 (1955)). But the plaintiff also cites to a case noting that "it remains the prerogative of the State of Wisconsin to afford greater protection to the liberties of persons within its boundaries under the Wisconsin Constitution than is mandated by the United States Supreme Court under the Fourteenth Amendment." *Id.* ¶ 37 (citing *State v. Doe*, 78 Wis. 2d 161, 171 (1977)).

Count Two of the complaint alleges that the union-leave policy violates the "public purpose doctrine" that the Wisconsin Supreme Court has developed as a state constitutional doctrine. *Id.* ¶¶ 53–62. According to the plaintiff, under this doctrine, public

3

funds may be expended only for public purposes, and any expenditure of public funds for private purposes "would be abhorrent to the [C]onstitution of Wisconsin." *Id.* ¶ 55 (citing *State ex rel. Warren v. Nusbaum*, 59 Wis. 2d 391, 414 (1973)). The plaintiff alleges that the union-leave policy "allows the expenditure of public funds solely to support and advance the mission and expressive advocacy goals of a labor union," which is not a public purpose. *Id.* ¶¶ 58–59.

After receiving service of the state-court summons and complaint, the defendants removed the action to this court under 28 U.S.C. § 1441. The notice of removal alleges that this action is within the original jurisdiction of a district court under 28 U.S.C. § 1331 because the plaintiff's right to relief "necessarily depends on the resolution of a substantial question of federal law." Not. of Removal ¶ 6. This is so, the defendants allege, because the Wisconsin Supreme Court interprets the free-speech guarantee of the Wisconsin Constitution consistently with the Free Speech Clause of the First Amendment to the United States Constitution. *Id.* ¶ 6.c. Thus, the defendants allege, the plaintiff's claim under the free-speech guarantee of the Wisconsin Constitution necessarily depends on whether the union-leave policy violates the Free Speech Clause of the First Amendment.

The plaintiff now moves to remand the case to state court and for an award of the costs and attorneys' fees caused by the removal. *See* 28 U.S.C. § 1447(c). He contends that, for two reasons, his claims do not fall within the original jurisdiction of a United States district court. First, he insists that his claim under the free-speech guarantee of the Wisconsin Constitution does not arise under federal law. Second, he contends that, because he brings this suit solely as a taxpayer, he does not have Article III standing to challenge the union-leave policy in federal court.

4

## II. DISCUSSION

Under 28 U.S.C. § 1441(a), a defendant may remove a "civil action brought in a State court of which the district courts of the United States have original jurisdiction." But a party who opposes the removal may file a motion to remand the case to state court. *See* 28 U.S.C. § 1447(c). "An order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal." *Id.*

In the present case, the defendants contend that this court has original jurisdiction over the plaintiff's state-court action under 28 U.S.C. § 1331, which grants district courts original jurisdiction "of all civil actions arising under the Constitution, laws, or treaties of the United States." Whether a civil action arises under federal law is determined by the "well-pleaded complaint rule," which provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint. *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987). "The rule makes the plaintiff the master of the claim; he or she may avoid federal jurisdiction by exclusive reliance on state law." *Id.*; *see also The Fair v. Kohler Die & Specialty Co.*, 228 U.S. 22, 25 (1913) ("Of course, the party who brings a suit is master to decide what law he will rely upon . . . ."). Further, because "[o]nly state-court actions that originally could have been filed in federal court may be removed to federal court by the defendant," *Caterpillar*, 482 U.S. at 392, a complaint that satisfies the well-pleaded complaint rule may not be removed to federal court if the plaintiff lacks Article III standing to assert the claim. *Collier v. SP Plus Corp.*, 889 F.3d 894, 896–97 (7th Cir. 2018).

In the present case, the plaintiff contends that the case must be remanded because his state constitutional claims do not arise under federal law and he does not

5

have Article III standing to assert any claim against the union-leave policy based on his status as a taxpayer.

**A.    Whether Plaintiff's Free-Speech Claim Arises Under Federal Law**

As noted, the plaintiff brings two claims under the Wisconsin Constitution and does not assert a claim for relief under the Constitution of the United States or any other federal law. Although the plaintiff's factual allegations are perhaps consistent with a claim under the Free Speech Clause of the First Amendment, he has exercised his right, as master of the complaint, to rely exclusively on state law. *Caterpillar*, 482 U.S. at 392; *The Fair*, 228 U.S. at 25. Thus, federal law does not create the plaintiff's cause of action.

The defendants do not dispute these points. However, they contend that, because the Wisconsin Supreme Court generally interprets the free-speech guarantee of the Wisconsin Constitution consistently with the Free Speech Clause of the First Amendment, the plaintiffs' state-law free-speech claim necessarily involves the resolution of a substantial question of federal law. This argument is based on an "extremely rare exception[]" to the rule that only federal claims "arise under" federal law. *Gunn v. Minton*, 568 U.S. 251, 257 (2013). Under that exception, a federal issue presented in a state-law claim may trigger federal-question jurisdiction if "a state-law claim necessarily raise[s] a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 314 (2005). The Supreme Court has restated this standard in the form of a four-part test. Under this test, "federal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of

6

resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn*, 568 U.S. at 258.

The defendants concede that, under the first part of the *Grable* inquiry, "the resolution of the state-law claim must also require a resolution of the federal issue." Br. in Opp. at 4, ECF No. 10 (citing *Empire Healthchoice Assurance, Inc. v. McVeigh*, 547 U.S. 677, 700 (2006)). Here, because the plaintiff brings claims exclusively under the Wisconsin Constitution, it would seem that resolution of his claims will not necessarily require the resolution of any federal issue. That is not so, the defendants contend, because the Wisconsin Supreme Court generally interprets the free-speech guarantee of the Wisconsin Constitution consistently with how the Supreme Court of the United States interprets the Free Speech Clause of the First Amendment. The defendants thus apparently believe that any court that resolves the plaintiff's state free-speech claim *necessarily* must also decide a question of federal constitutional law. But that is not the case, as I will explain.

The defendants correctly observe that Wisconsin courts consistently interpret Article I, § 3 of the Wisconsin Constitution to guarantee the same freedom of speech rights as the First Amendment to the United States Constitution. *See County of Kenosha v. C & S Mgmt., Inc.*, 223 Wis. 2d 373, 388 (1999); *Lawson v. Hous. Auth. of City of Milwaukee*, 270 Wis. 269, 274 (1955). But from this observation it does not follow that the plaintiff's state free-speech claim *necessarily* raises a question of federal constitutional law. That is because a court is not compelled to decide how an analogous claim under the federal constitution would come out before deciding how the claim will come out under the state constitution. Unless the plaintiff asserts a claim under the federal constitution in

7

addition to a claim under the state constitution—which the plaintiff here has not—a court may simply decide the plaintiff's state constitutional claim. To be sure, a court faced with the plaintiff's state free-speech claim *might* look to federal law for guidance and *might* try to predict how the Supreme Court of the United States would answer the same legal question. But these possibilities do not satisfy the first element of the *Grable* inquiry. Under that element, the state-law claim must "*necessarily* raise a stated federal issue." *Grable*, 545 U.S. at 314 (emphasis added). The mere possibility that a court could resolve the plaintiff's state free-speech claim without deciding the analogous federal claim is thus enough to defeat federal-question jurisdiction.

The defendants seem to contend that, because the Wisconsin Supreme Court has stated that the free-speech rights afforded by the Wisconsin Constitution are identical to the free-speech rights afforded by the First Amendment, any decision on the plaintiff's state free-speech claim necessarily will decide the same issue for purposes of federal law. But, as the defendants acknowledge, "the Wisconsin Supreme Court is not prevented from interpreting the Wisconsin Constitution to provide greater protections of liberties than the minimums imposed by the U.S. Constitution." Br. in Opp. at 6. And although Wisconsin courts "have heretofore found no differences in the freedom of speech guarantees provided by the First Amendment and Article I, § 3," *County of Kenosha*, 233 Wis. 2d at 388, nothing precludes them from doing so. Indeed, in the very case in which the Wisconsin Supreme Court recognized that it had not yet identified any protections in Article I, § 3 that did not already exist under the First Amendment, the court took pains to make clear that it "reserves the right" to interpret the Wisconsin Constitution more expansively than the federal constitution. *County of Kenosha*, 233 Wis. 2d at 391. And

8

because it is possible that the Wisconsin Constitution provides greater protection than the First Amendment, a decision under Article I, § 3 will not necessarily determine how an analogous claim would come out under federal law.

Accordingly, the first part of the *Grable* inquiry is not met. Likewise, the fourth part—which asks whether the claim is "capable of resolution in federal court without disrupting the federal-state balance approved by Congress," *Gunn*, 568 U.S. at 258—is not met. That is so because the defendants' argument implies that federal courts are the final arbiters of the meaning of a provision of the Wisconsin Constitution. Under the defendants' approach, in which every claim under the state free-speech guarantee necessarily raises a federal issue, every case brought under the state guarantee would be removable to federal court and would be decided as a matter of federal constitutional law. This, in turn, would rob the Wisconsin Supreme Court of its power to decide whether, in certain areas, the free-speech guarantee of the Wisconsin Constitution provides more protection than the First Amendment. The defendants seem to defend this outcome by noting that the Wisconsin Supreme Court has already held that the Wisconsin Constitution guarantees the same liberties as the First Amendment. But, as I have explained, the Wisconsin Supreme Court has expressly reserved the right to interpret the Wisconsin guarantee more expansively in future cases. Moreover, even if the supreme court had not expressly reserved such a right, it would surely upset the federal-state balance for a federal court to hold that the Wisconsin Supreme Court was irrevocably committed to interpreting the Wisconsin guarantee exactly as the Supreme Court of the United States interprets the First Amendment. *See Michigan v. Long*, 463 U.S. 1032, 1041 (1983) ("It is fundamental that state courts be left free and unfettered . . . to interpret

9

their state constitutions."). Thus, treating all claims brought under the state free-speech guarantee as arising under federal law would significantly disrupt the federal-state balance approved by Congress.

In arguing that the plaintiff's case is removable under *Grable*, the defendants rely on the Second Circuit's decision in *Bracey v. Board of Education of City of Bridgeport*, 368 F.3d 108 (2d Cir. 2004). In that case, a teacher alleged that a public school terminated his employment in retaliation for his having exercised his rights under the Free Speech Clause of the First Amendment and the free-speech guarantee of the Connecticut Constitution. *Id.* at 115. The teacher originally filed the case in state court, and his state-court complaint also alleged a federal claim for race-based discrimination in violation of 42 U.S.C. § 1981. *Id.* at 111. The school removed the case to federal court based on the presence of the federal claim. *Id.* During the litigation in federal court, the plaintiff dropped his federal claims. However, he went to trial on his claim under a Connecticut statute that prohibited retaliation against an employee for exercising rights under the First Amendment to the United States Constitution or the equivalent provisions of the Connecticut Constitution. *Id.* at 111–12 n.3 (quoting Conn. Gen. Stat. § 31–51q). After the jury found for the plaintiff, the school appealed and argued, among other things, that the district court erred in exercising "pend[e]nt jurisdiction" over this state-law claim after the federal § 1981 claim was dropped. *Id.* at 112. The Second Circuit rejected this argument because, in its view, the claim under the Connecticut statute raised "a substantial federal question because [it] necessarily turn[ed] on the construction of federal law." *Id.* at 113. The court reached this conclusion because (1) the Connecticut statute expressly incorporated the First Amendment and (2) Connecticut courts "consistently look

10

to federal First Amendment law to determine whether [the Connecticut statute] gives rise to a cause of action in the cases before them." *Id.* at 115–16.

The defendants rely on *Bracey* to support their argument that, when a state court interprets its own law consistently with the federal constitution, a claim under the state law will necessarily raise a federal issue. But the claim presented in *Bracey* was not based solely on a state constitutional provision, as Sebring's claim is here. Instead, the plaintiff brought a claim under a state statute that incorporated *both* the First Amendment and the analogous provisions of the state constitution. Further, the plaintiff in *Bracey* did not contend that the state constitution afforded broader protection than the First Amendment. Thus, the claim in *Bracey* could be said to have necessarily raised a federal issue because the meaning of the First Amendment was dispositive of the plaintiff's claim under the state statute. The same cannot be said of the claim in the present case. Here, the plaintiff relies exclusively on the Wisconsin Constitution and expressly pleads that the Wisconsin Constitution may afford him greater protection than the First Amendment. *See* Compl. ¶ 37. And, as I have explained, the fact that the Wisconsin courts have to date interpreted the Wisconsin Constitution consistently with the First Amendment does not mean that the plaintiff's claim will necessarily require the resolution of an analogous First Amendment claim.[2]

_____

[2] I also note that the Second Circuit decided *Bracey* before the Supreme Court decided *Grable* and *Gunn*, both of which emphasize the narrowness of the jurisdictional exception for state-law claims that present substantial federal issues. In those cases, the Supreme Court made clear that the state-law claim must be capable of resolution in federal court without disrupting the federal-state balance approved by Congress. *Gunn*, 568 U.S. at 258; *Grable*, 545 U.S. at 314. In *Bracey*, the Second Circuit did not address whether this requirement was met.

Finally, the defendants cite the Supreme Court's decision in *Delaware v. Prouse*, 440 U.S. 648 (1979), in support of their argument that exercising federal jurisdiction over the plaintiff's state constitutional claim would be consistent with the federal-state balance approved by Congress. *Prouse* was a criminal case that arose in the Delaware state courts. Before trial, the defendant filed a motion to suppress evidence on the ground that the police found the evidence during a seizure that violated the Fourth Amendment. The seizure in question was a stop of an automobile that was not supported by reasonable suspicion or probable cause. The Delaware Supreme Court held that the search violated both the Fourth Amendment and the analogous provision of the Delaware Constitution. *Id.* at 651–52. After the Supreme Court of the United States agreed to review the decision of the Delaware Supreme Court, the respondent argued that the Court lacked jurisdiction because the decision below was based on an independent and adequate state ground, namely, the unreasonable-seizure provision of the Delaware Constitution. *Id.* The Supreme Court rejected this argument, finding that "the Delaware Supreme Court did not intend to rest its decision independently on the State Constitution." *Id.* at 652. The Court noted that, under Delaware law, the relevant provision of the Delaware Constitution "will automatically be interpreted at least as broadly as the Fourth Amendment." *Id.* Thus, once the Delaware Supreme Court determined that the stop violated the Fourth Amendment, it adopted the same construction of the Delaware Constitution. The Supreme Court of the United States reasoned that because the Delaware Supreme Court might have interpreted the Delaware Constitution differently had it not found a federal violation, the Court had jurisdiction to determine whether the state court's view of federal law was correct. If the state court's view of federal law was not correct, a decision by the Supreme

12

Court finding the seizure constitutional would "free[]" the state court to decide whether the search nonetheless violated the state constitution. *Id.* at 653.

Contrary to the defendants' argument, *Prouse* does not suggest that exercising original jurisdiction over the present case would be consistent with the federal-state balance approved by Congress. Importantly, *Prouse* was not a case that originated in federal court under § 1331; it came before the Supreme Court on certiorari review from the Delaware Supreme Court under 28 U.S.C. § 1257. Under § 1257, the Supreme Court may resolve federal issues that arise in state cases even if the state case could not have been brought in a federal district court originally. *See Penobscot Nation v. Georgia-Pacific Corp.*, 254 F.3d 317, 324 (1st Cir. 2001). With § 1257, then, Congress granted the Supreme Court greater authority to adjudicate federal issues than it granted to district courts under § 1331. So although the exercise of federal jurisdiction in *Prouse* was compatible with the federal-state balance approved by Congress in § 1257, it does not follow that a district court's exercising jurisdiction under the same circumstances would be consistent with the federal-state balance approved by Congress in § 1331.

Moreover, *Prouse* does not imply that a federal issue will necessarily arise whenever a state court holds that a state constitutional provision is coterminous with its analogous federal provision. In *Prouse*, the Supreme Court simply observed that the Delaware Supreme Court likely felt constrained by its view of federal law to invalidate the stop and, for that reason, did not separately consider whether the stop was consistent with the Delaware Constitution. The Court exercised federal jurisdiction to ensure that, if the state court's view of federal law were incorrect, the state court would be "freed" to determine whether the Delaware Constitution provided greater protection than the Fourth

13

Amendment. 440 U.S. at 653. In this way, *Prouse* recognizes that, even when a state court ordinarily interprets its own constitutional provision consistently with federal law, the answer to the state-law question will not necessarily involve resolution of the analogous federal issue.

In short, the plaintiff's claim under the free-speech guarantee of the Wisconsin Constitution does not "necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Grable*, 545 U.S. at 314. For this reason alone, I lack jurisdiction under 28 U.S.C. § 1331 and must remand the case to state court.

## B.    Taxpayer Standing

For a case to be removable, it must be one that the plaintiff originally could have filed in federal court. *See* 28 U.S.C. § 1441(a); *Collier*, 889 F.3d at 896. One element of federal subject-matter jurisdiction is the "Case" or "Controversy" requirement of Article III of the Constitution, which requires a plaintiff to have standing to sue. *See, e.g., Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559–60 (1992). To have standing, a plaintiff must have suffered an injury in fact that is fairly traceable to the acts of the defendant and that is likely to be redressed by favorable judicial relief. *Id.* at 560–61. If the state-court plaintiff does not have standing to bring his claim, then he or she could not have filed the suit in federal court, and the case is not removable. *Collier*, 889 F.3d at 896–97.

In the present case, the plaintiff contends that he does not have standing to challenge the union-leave policy in federal court because he has not alleged that the policy caused him an injury in fact that satisfies Article III. For a plaintiff to allege such an

14

injury, he must allege "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" *Lujan*, 504 U.S. at 560 (citations omitted). The plaintiff points out that his standing in state court was based on his status as a state and local taxpayer. Under Article III, however, a taxpayer's objection to an expenditure of government funds generally does not satisfy the injury-in-fact requirement because the alleged injury is not "concrete and particularized" or "actual or imminent." *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342–46 (2006).

The defendants contend that, under the rationale of *Flast v. Cohen*, 392 U.S. 83 (1968), the plaintiff has taxpayer standing. In *Flast*, the Court identified an exception to the rule against taxpayer standing that applies when two conditions are met. First, the taxpayer must be alleging the unconstitutionality "of exercises of congressional power under the taxing and spending clause of Art. I, § 8, of the Constitution." *Id.* at 102. Under this prong, "[i]t will not be sufficient to allege an incidental expenditure of tax funds in the administration of an essentially regulatory statute." *Id.* Second, "the taxpayer must show that the challenged enactment exceeds specific constitutional limitations imposed upon the exercise of the congressional taxing and spending power and not simply that the enactment is generally beyond the powers delegated to Congress by Art. I, § 8." *Id.* at 102–03. In *Flast,* the Court determined that these two conditions were met when a federal taxpayer sued to enjoin an Act of Congress that appropriated funds to religious schools allegedly in violation of the Establishment Clause of the First Amendment.

Since *Flast* was decided, the Supreme Court has not extended taxpayer standing to suits based on constitutional provisions other than the Establishment Clause. And in the present case, to the extent that the plaintiff's complaint could be construed as

15

asserting a federal constitutional claim at all, the claim would arise under the Free Speech Clause of the First Amendment, not the Establishment Clause. Thus, it would seem that *Flast* is clearly inapplicable. But the defendants contend that *Flast* should be expanded to cover taxpayer suits based on the Free Speech Clause. They contend that the Free Speech Clause is a "specific constitutional limitation[] imposed upon the government's taxing and spending powers," and that therefore a taxpayer alleging that the government has spent funds in violation of the Free Speech Clause should have standing to sue. Br. in Opp. at 14.

The defendants' argument for an expansion of *Flast* overlooks much binding authority decided during the last few decades. As the Seventh Circuit has observed, the Supreme Court's decisions since *Flast* have "made it abundantly clear that *Flast* is not to be expanded *at all*." *Laskowski v. Spellings*, 546 F.3d 822, 826 (7th Cir. 2008). Instead, "the reach of *Flast* is now strictly confined to the *result* in *Flast*," and "the result in *Flast* was that the taxpayers had standing to seek an injunction to halt a specific congressional appropriation alleged to violate the Establishment Clause." *Id.* at 827. Thus, "taxpayers continue to have standing to sue for injunctive relief against specific congressional appropriations alleged to violate the Establishment Clause, but that is all." *Id.*

Here, the plaintiff is not suing for injunctive relief against a specific congressional appropriation alleged to violate the Establishment Clause. Again, to the extent that the plaintiff has asserted any federal constitutional claim (which, as I have explained, he has not), his claim would be based on the Free Speech Clause. Moreover, even if *Flast* could be extended to challenges based on the Free Speech Clause, that would mean only that the second part of *Flast*'s two-pronged test for taxpayer standing was satisfied. The

plaintiff would still have to satisfy the first prong, which requires challenging a specific exercise of congressional spending power rather than "an incidental expenditure of tax funds." *Flast*, 392 U.S. at 103.[3]

The defendants do not show that the plaintiff is challenging a specific state enactment or legislatively created program. Based on the plaintiff's complaint, it appears that he is challenging only an incidental expenditure of tax funds pursuant to the state's "general appropriations" to MPS "to fund its day-to-day activities." *See Hein v. Freedom From Religion Foundation, Inc.*, 551 U.S. 587, 605 (2007) (holding that a challenge to a spending decision made by the executive branch pursuant to general appropriations does not satisfy *Flast*'s first prong). The complaint does not identify any state statute or other legislative enactment specifically authorizing MPS to pay its employees their salaries and benefits while they are absent from work to conduct union business. Instead, the complaint alleges that the challenged practice is set out in MPS's "Employee Handbook." Compl. ¶¶ 9–16. The MPS Employee Handbook is obviously not a state statute, and it would seem that, to the extent the union-leave policy is subsidized by state tax dollars, it is subsidized by whatever general appropriations the state approved for the funding of MPS's day-to-day activities. In any event, as the proponents of federal jurisdiction, the defendants have the burden to prove that the plaintiff has standing. *Fox v. Dakkota*

---

[3] The plaintiff challenges an expenditure of tax funds authorized by state government rather than by Congress, and so for this reason alone *Flast* would have to be expanded to give the plaintiff standing here. But because the Seventh Circuit has analyzed state taxpayer challenges to state expenditures without questioning whether *Flast* grants taxpayers standing to challenge state appropriations under the Establishment Clause, *see, e.g., Hinrichs v. Speaker of House of Representatives of Indiana*, 506 F.3d 584 (7th Cir. 2007), I will assume without deciding that *Flast* is not limited to cases challenging federal expenditures.

17

*Integrated Sys., LLC,* 980 F.3d 1146, 1151 (7th Cir. 2020). Because the defendants have not identified any specific state statute that creates and funds the union-leave policy, they have not shown that the first prong of *Flast*, as interpreted by *Hein*, is satisfied. *See also Sherman v. Illinois*, 682 F.3d 643, 646–47 (7th Cir. 2012) (holding that state taxpayer lacked standing to challenge state expenditure under Establishment Clause because taxpayer pointed to no "specific and binding legislative action" directing that funds be disbursed to religious group).

Accordingly, the plaintiff clearly does not have taxpayer standing under *Flast*. But this case potentially implicates another exception to the rule against taxpayer standing, which applies to municipal taxpayers. The Seventh Circuit has described municipal taxpayer standing as "a bit of a relic in the modern landscape of standing." *Protect Our Parks, Inc. v. Chicago Park District*, 971 F.3d 722, 733 (7th Cir. 2020). It derives from Supreme Court cases that predate the Court's modern approach to standing, as stated in cases such as *Lujan*. *See id.* (identifying *Crampton v. Zabriskie*, 101 U.S. 601 (1879) and *Frothingham v. Mellon*, 262 U.S. 447 (1923) as the progenitors of municipal taxpayer standing). Under the rule of these cases, "resident taxpayers may sue to enjoin an illegal use of the moneys of a municipal corporation." *Id.* (quoting *Frothingham*). This rule is based on an analogy between municipal corporations and private corporations, and it assumes that municipal taxpayers have a closer relationship with their municipalities than state and federal taxpayers have with their state governments or the federal government. *Id.* at 733–34. The Seventh Circuit has noted that this rationale is "anomalous," in that there is no reason to suppose "a suit brought by one of Chicago's 2.6 million residents any more particularized than a suit by any of the 579,000 citizens of Wyoming." *Id.*

18

Nonetheless, the Supreme Court has not overruled its cases recognizing standing for municipal taxpayers, and therefore lower courts must continue to apply it. *Id.* at 734.

Municipal taxpayer standing has two threshold requirements. *Id.* First, the plaintiff must actually be a taxpayer of the municipality that she wishes to sue. *Id.* Here, I will assume that this requirement is satisfied, as the complaint alleges that the plaintiff is a resident of the City of Milwaukee and lives within the boundaries of the Milwaukee Public School District. Compl. ¶ 5. The second requirement for municipal taxpayer standing is that the proponent of federal jurisdiction show that the municipality has spent tax revenues on the allegedly illegal action. *Protect Our Parks*, 971 F.3d at 734. To satisfy this requirement, the proponent must show "that the municipality has actually expended funds *on the allegedly illegal elements* of the disputed practice." *Id.* at 735. Moreover, it is not sufficient to show that the municipality has spent some money on the disputed practice. *Id.* at 735–36. Rather, the proponent of federal jurisdiction must show that any funds spent by the municipality on the allegedly illegal elements of the practice are municipal tax funds rather than funds received from some other source, such as "licensing fees, parking tickets, concessions contracts, [or] federal and state grants." *Id.* Thus, to show that the plaintiff has standing as a municipal taxpayer, the defendants, as the proponents of federal jurisdiction, must show that the City of Milwaukee spends tax dollars on the union-leave policy challenged by the plaintiff.

Here, the defendants point to the complaint's allegation that "Defendants are directing tax dollars to fund union activities without Plaintiff's consent via the union leave policy." Br. in Opp. at 15 (quoting Compl. ¶ 51). Importantly, however, the complaint does not allege that the "tax dollars" at issue are solely municipal tax dollars. Instead, the

19

complaint alleges that "MPS is funded, in large part, by taxes paid by state and local taxpayers," Compl. ¶ 26, and it does not go on to specify whether the money MPS uses to fund the union-leave policy comes from state taxes, municipal taxes, or a combination of both. Thus, as far as the allegations of the complaint reveal, the money that funds the policy could come entirely from *state* tax revenues, in which case the plaintiff would not have municipal taxpayer standing.

The defendants have not closed this gap in the plaintiff's complaint by alleging in their notice of removal that municipal taxes fund the policy. This may be because they apparently believe that the plaintiff's standing must be determined by the "four corners" of the complaint under the "well-pleaded complaint rule." Br. in Opp. at 15. But this belief is mistaken. To begin with, the well-pleaded complaint rule does not determine whether a plaintiff has standing; it determines, instead, whether a complaint states a claim that arises under federal law for purposes of 28 U.S.C. § 1331. A case may be remanded for lack of standing even if the complaint satisfies the well-pleaded complaint rule. *See, e.g., Collier*, 889 F.3d at 896 (remanding case alleging violation of federal statute because plaintiff lacked standing to sue in federal court). Moreover, the defendants are the proponents of federal jurisdiction, and so it is their notice of removal, rather than the complaint, that must contain the factual allegations necessary to support federal jurisdiction. *See* 28 U.S.C. § 1446(a) (notice of removal shall "contain[] a short and plain statement of the grounds for removal"). If the defendants believed that the case was removable because the plaintiff has municipal taxpayer standing, they could have expressly alleged facts in their notice of removal showing that the union-leave policy is funded by municipal taxes. *See Betzner v. Boeing Company*, 910 F.3d 1010, 1014–16

20

(7th Cir. 2018) (interpreting allegations of notice of removal to determine whether removal was proper); *Lu Junhong v. Boeing Co.*, 792 F.3d 805, 815 (7th Cir. 2015) (noting that defendant's allegations in support of removal will generally be accepted as true). But the defendants did not allege such facts, and therefore I cannot conclude that the union-leave policy is funded by municipal taxes.

In short, the defendants have not shown that the plaintiff has standing to bring his claims in a federal court. Accordingly, even if the state complaint asserted a claim that arises under federal law, the case would have to be remanded.

## C.    Costs and Attorney Fees

Under 28 U.S.C. § 1447(c), "[a]n order remanding a removed case to state court 'may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal.'" *Martin v. Franklin Cap. Corp.*, 546 U.S. 132, 134, (2005) (quoting 28 U.S.C. § 1447(c)). A district court may award fees under § 1447(c) if the removing party lacked an objectively reasonable basis for seeking removal. *Martin*, 546 U.S. at 141. The Seventh Circuit has held that, "[a]s a general rule, if, at the time the defendant filed his notice in federal court, clearly established law demonstrated that he had no basis for removal, then a district court should award a plaintiff his attorneys' fees." *Lott v. Pfizer, Inc.*, 492 F.3d 789, 793 (7th Cir. 2007). By contrast, "if clearly established law did not foreclose a defendant's basis for removal, then a district court should not award attorneys' fees." Under this standard, sanctions may be awarded when removal is clearly improper, but not necessarily frivolous. *Jackson County Bank v. DuSablon*, 915 F.3d 422, 424 (7th Cir. 2019).

21

As discussed above, the removal of this case was improper for two reasons: (1) the plaintiff's state constitutional claims do not arise under federal law, and (2) the plaintiff does not have Article III standing to assert his claims in federal court. Because, for the removal to be proper, the defendants had to demonstrate both the existence of a federal question and the plaintiff's standing, I should award the plaintiff his costs and fees if clearly established law provided notice to the defendants that either of these problems foreclosed removal. I consider each problem in turn.

Regarding the first problem, it initially seems obvious that the defendants lacked an objectively reasonable basis for thinking that claims asserted under a state constitution could be deemed to present a federal question. After all, it sems absurd to argue that a case brought exclusively under a state constitution could arise under federal law. But, on closer inspection, the answer is not so obvious. Under *Grable* and related cases, state-law claims may sometimes present federal issues and be deemed to arise under federal law. Further, the Wisconsin Supreme Court has interpreted the free-speech guarantee of the Wisconsin Constitution consistently with the First Amendment, and thus it is not objectively unreasonable to assert that a claim under the Wisconsin guarantee will require resolution of a First Amendment question. At the very least, no federal appellate case of which I am aware clearly establishes that a claim based on a state constitutional provision that mirrors a provision of the federal constitution and is generally interpreted as being coterminous with the federal provision cannot arise under federal law. Moreover, the Supreme Court has itself described its cases in this area as "unruly" and as presenting a "canvas [that] looks like one that Jackson Pollock got to first." *Gunn*, 568 U.S. at 258. In light of the Court's description, it is hard to say that the relevant authorities clearly dictate

the outcome of cases raising novel issues, as the present case does. For these reasons, I conclude that the defendants' removal based on the presence of a federal question was not objectively unreasonable.

Regarding taxpayer standing, I do think that the defendants' argument based on *Flast v. Cohen* was objectively unreasonable. The defendants argued that *Flast* should be expanded to cover claims in which a plaintiff challenges a government spending decision on the ground that it violates the Free Speech Clause rather than the Establishment Clause. But this argument is foreclosed by clearly established law, namely, the Seventh Circuit's observation that "the Supreme Court has now made it abundantly clear that *Flast* is not to be expanded *at all*." *Laskowski*, 546 F.3d at 826. Further, as I explained, the defendants also overlooked the binding cases interpreting the first prong of the *Flast* inquiry to require that the taxpayer be challenging a legislative appropriation specifically authorizing the challenged practice rather than an agency's discretionary expenditure of general appropriations. *Hein*, 551 U.S. at 605-09; *Sherman*, 682 F.3d at 646–47; *Hinrichs*, 506 F.3d at 598–600. The defendants simply assumed, contrary to this clearly established law, that any expenditure of tax dollars could be challenged under *Flast* so long as the challenge involved a constitutional limitation on a government's spending power.

As to the possibility of municipal taxpayer standing, it is clearly established that the proponent of federal jurisdiction must show that municipal tax dollars were actually used to fund the allegedly illegal elements of the disputed practice. *Protect Our Parks*, 971 F.3d at 735. The defendants, however, did not include any factual allegations in their notice of removal showing that the union-leave policy is funded by municipal taxes. Although the

23

defendants relied on the plaintiff's complaint to show that municipal taxes funded the policy, the complaint did not make clear that the policy is funded by municipal taxes rather than state taxes. So, under clearly established law, as applied to the present factual record, the defendants failed to carry their burden to establish municipal taxpayer standing. It thus appears that their removal based on municipal taxpayer standing was objectively unreasonable.

However, the Supreme Court has stated that, in "unusual circumstances," a district court may decline to award costs and fees even if the removal was objectively unreasonable. *Martin*, 546 U.S. at 141. The Court did not exhaustively catalogue the circumstances that qualify for this exception, but it stated that, when a district court exercises its discretion to find the circumstances unusual, it should remain "faithful to the purposes" of awarding fees under § 1447(c), *id.* at 141, which are to deter removals "sought for the purpose of prolonging litigation and imposing costs on the opposing party, while not undermining Congress' basic decision to afford defendants a right to remove as a general matter, when the statutory criteria are satisfied," *id.* at 140.

In the present case, I conclude that unusual circumstances are present. They relate to municipal taxpayer standing. As I have explained, the defendants failed to carry their burden to show that the plaintiff has such standing because they failed to allege in their notice of removal that municipal taxes are used to pay the salaries and benefits of MPS employees while they are using union leave. Ordinarily, I would give a proponent of federal jurisdiction at least one opportunity to amend defective jurisdictional allegations before dismissing or remanding a case. *See* 28 U.S.C. § 1653; *Dancel v. Groupon, Inc.*, 940 F.3d 381, 384–85 (7th Cir. 2019) (discussing amendment of notice of removal to cure

24

defective jurisdictional allegations). But in the present case, granting such leave would be futile because, even if the defendants could establish municipal taxpayer standing, the case would have to be remanded due to the lack of a federal question. It seems likely that, had I granted leave to amend, the defendants could have alleged that at least some municipal taxes are used to fund the salary and benefits of MPS employees. At that point, the removal would have been proper and thus not objectively unreasonable.[4] But, because the case must be remanded in any event due to the lack of a federal question, it would wastefully prolong the litigation to grant the defendants leave to amend their notice of removal solely to show that the removal was objectively reasonable. Under these unusual circumstances, I conclude that the purposes of § 1447(c) would not be served by an award of costs and fees. Instead, I will assume that, had I granted the defendants leave to amend, they would have been able to allege that at least some municipal taxes are used to pay the salary and benefits of MPS employees while they are using union leave.

---

[4] If sources in addition to municipal taxes are used to fund MPS employee salaries and benefits, then the plaintiff would not have Article III standing to seek an injunction preventing the defendants from continuing to fund union leave with those sources. *See Cuno*, 547 U.S. at 350–53 (holding that a plaintiff's having standing to challenge the use of municipal taxes to fund a practice does not grant him "ancillary standing" to challenge the use of state taxes to fund the same practice). But, under 28 U.S.C. § 1441(c), the plaintiff's challenge to the use of nonmunicipal tax funding could have been severed from the case and remanded, and then the case could have continued as to the municipal taxes alone.

25

### III. CONCLUSION

For the reasons stated, **IT IS ORDERED** that the plaintiff's motion to remand is **GRANTED**. The Clerk of Court shall remand this matter to the Milwaukee County Circuit Court.

**IT IS FURTHER ORDERED** that the plaintiff's request for costs and attorneys' fees under 28 U.S.C. § 1447(c) is **DENIED**.

Dated at Milwaukee, Wisconsin, this 1st day of November, 2021.


s/Lynn Adelman
LYNN ADELMAN
United States District Judge

26